UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.:_____

VITACOST.COM, INC.,
a Delaware corporation,

                    Plaintiff,

          v.

SHEFSKY & FROELICH, LTD., an
Illinois corporation,

                    Defendant.
_____

## COMPLAINT

Plaintiff Vitacost.com, Inc. ("Vitacost" or the "Company"), by and through its undersigned counsel, files its Complaint against Defendant Shefsky & Froelich. Ltd. ("Shefsky"), and states:

### Nature And Summary Of The Action

1.      This action arises from the negligent legal services that Shefsky provided to Vitacost in connection with the Company's initial public offering (the "IPO").  The law firm – having represented Vitacost in numerous corporate and litigation matters since at least 2002 – held itself out as knowledgeable and proficient in Delaware corporate law and capable of planning and executing Vitacost's IPO.

2.      Days before the IPO closed, Shefsky issued an unqualified legal opinion letter (the "Opinion Letter") stating that the shares of stock to be offered for sale by Vitacost were duly authorized, validly issued, fully paid and nonassessable.  Vitacost relied upon the Opinion Letter, included it as an exhibit to the registration statement, and proceeded to complete its IPO transforming Vitacost from a privately held company to one publicly traded on the NASDAQ.

3.      Unbeknownst to Vitacost, the Opinion Letter was riddled with errors and critical omissions relating to the authority, issuance, payment and assessibility of the shares it purported to validate.  The steps that led to the issuance of the Opinion Letter are known.  Shefsky failed to

adequately conduct the due diligence necessary for taking the Company public; it failed to detect and apprise the Company of serious deficiencies relating to the Company's formation, capital structure and share issuance and the ramifications of non-compliance with the General Corporation Law of the State of Delaware ("DGCL") relating to, among other things, the formation of the Company's original board of directors.

4.       The subsequent discovery of the deficiencies and non-compliance with the DGCL had a material adverse impact on Vitacost, jeopardizing its very corporate existence and causing it to incur millions of dollars in fees and costs to rectify the defects, as well as additional millions in consequential damages.  Had Shefsky exercised reasonable care in the performance of its legal services for the Company, it would have detected the governance and share issuance defects, and advised the Company to take the appropriate steps to correct those defects prior to the IPO. Instead, Shefsky's negligent advice, memorialized, in part, in its erroneous Opinion Letter, set off a chain of events that threatened Vitacost's very corporate existence.

## The Parties

5.       Plaintiff Vitacost is a publicly traded Delaware corporation with its principal place of business in Boca Raton, Florida.  Vitacost operates as an online retailer of health and wellness products.

6.       Defendant Shefsky is a professional service corporation engaged in the practice of law, as duly authorized under Illinois law, and organized under the law of the state of Illinois. Shefsky's office is located in Chicago, Illinois.

## Jurisdiction And Venue

7.       This Court has subject matter jurisdiction over this case and all causes of action asserted pursuant to 28 U.S.C. § 1332 because there is complete diversity between Plaintiff and Defendant and the amount in controversy exceeds $75,000.

8.       This Court has personal jurisdiction over Defendant under Section 48.193 (1)(b), (1)(f), and (1)(g), Florida Statutes, in that Defendant breached a contract in this state, committed tortious acts in this state, and caused injury to Plaintiff in this state arising out of acts and

omissions taking place outside this state while engaged in solicitation or service activities in the state as further set forth herein.  By virtue of acts directed at the forum, Defendant (a) could and should reasonably have anticipated being haled into court in the state of Florida and (b) purposefully availed itself of the state of Florida's privileges and protections, justifying the Court's exercise of personal jurisdiction under Florida's Long Arm Statute and the United States Constitution.

9.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this Judicial District and because Vitacost suffered damages in this Judicial District as a result of the actions of Shefsky that are the subject of this Complaint.

10.    Specifically, a substantial portion of the legal advice, representations and omissions which are the subject of this Complaint where communicated by Shefsky to Vitacost, its officers and directors, in Florida.

11.    All conditions precedent to this action have been waived, satisfied and/or fulfilled.

## Factual Background

12.    Vitacost retained Shefsky as outside legal counsel in 2002.  Shefsky performed various aspects of Vitacost's corporate legal work until late 2010, with Shefsky's corporate and securities attorneys, including, specifically, but not limited to, Shareholder Mitchell Goldsmith ("Goldsmith"), handling filings with the Delaware Secretary of State and frequently attending (telephonically or in person) the Company's Board of Directors (the "Board") meetings which were held in Florida, including regularly serving as secretary for those meetings.

13.    During 2006, the Company began to consider an IPO.  Shefsky represented that it had experience in this area of corporate practice and with taking a Delaware corporation public, and that it was knowledgeable of the applicable laws and corporate requirements – the Securities Act of 1933 ("Securities Act"), the Exchange Act of 1934 ("Exchange Act"), and the DGCL. Based on these representations, Vitacost believed that Shefsky was qualified to advise the

Company in connection with its IPO and engaged Shefsky for that specific purpose. On May 5, 2006, Goldsmith sent an e-mail to Vitacost in Florida outlining the information that Shefsky would need in order to complete the registration statement and related due diligence for the IPO. Then, on December 16, 2006, the parties entered into a legal fee agreement relative to the services to be provided. A further agreement was entered into by the parties on August 4, 2008, which described the legal fees and services yet to be provided relative to the proposed IPO. The May 5, 2006 e-mail, the December 16, 2006 legal fee agreement and the August 5, 2008 legal fee agreement are attached hereto as **Composite Exhibit "A"** and are hereinafter collectively referred to as the "Contract."

14.     Under the terms and provisions of the Contract, Shefsky agreed to perform certain legal services, including, but not limited to:   (i) completing all Securities and Exchange Commission ("SEC") Form S-1 filings and conducting all due diligence; (ii) signing a 10(b)(5) representation letter and responding to all SEC and NASDAQ comment letters; and (iii) conducting any and all other work reasonably deemed necessary by Vitacost to close the IPO. Vitacost, in turn, agreed to pay all legal fees and costs billed by Shefsky in connection with services performed and to provide all corporate documents requested by Shefsky and deemed relevant and/or necessary by Shefsky to conduct its due diligence.

15.     Over the course of this engagement, Shefsky billed Vitacost over $700,000 in attorneys' fees and costs attributable to work on the Company's IPO. Vitacost fulfilled its obligations under the Contract, providing Shefsky with all requested documents and paying Shefsky a total of $726,632 for legal services provided.

16.     As part of the due diligence component of the engagement, Shefsky agreed to conduct a thorough review of the Company's organizational documents, the Corporate Minute Book, all stock and option issuances, and other corporate and governance records. Shefsky represented that it did, in fact, perform this work in the time period leading up to the Company's IPO.

17.     In completing the registration requirements for the Company's IPO, as required by Regulation S-K promulgated under the Securities Act, on September 18, 2009, Shefsky issued its unqualified Opinion Letter to Vitacost indicating that the shares of common stock being offered for sale in the Company's IPO were "duly authorized by all necessary corporate action" and were "validly issued, fully paid and nonassessable."  A true and correct copy of the Opinion Letter is attached hereto as **Exhibit "B".**

18.     In reliance on Shefsky's advice and on the truth of the representations and statements made by Shefsky in the Opinion Letter, Vitacost went public on September 24, 2009.

19.     Unbeknownst to Vitacost, however, Shefsky failed to identify a number of critical defects in Vitacost's issuances of stock and capital structure during the approximate two-year period in which Shefsky worked to prepare the Company's registration materials for its eventual IPO.  These defects rendered erroneous Shefsky's opinion that all of the shares of Vitacost common stock issued in the IPO were "duly authorized by all necessary corporate action" and "validly issued, fully paid and nonassessable."  Vitacost made this alarming discovery – over a year after completing its IPO – while it was conducting an unrelated internal review.

*The Internal Review*

20.     Beginning in Fall 2010, the new chair of the Board's Audit Committee (the "Audit Committee") undertook an internal review into the valuation methods the Company used in stock-based compensation grants and awards.  When the chair discovered discrepancies in the Company's corporate records on the stock option issuances, he sought and obtained the Board's approval to retain different legal counsel to assist in conducting the internal review.

21.     This internal review included an examination of the Company's historical corporate records.  When counsel identified a number of additional defects, they sought and obtained the Audit Committee's approval to hire Delaware counsel to determine the ramifications of these defects.  The Audit Committee and its counsel reported the findings of the internal review to the Board on December 1, 2010.

22.     Through the review conducted by these law firms, Vitacost learned for the first time that there was a fundamental flaw in the organization of the corporation.  Specifically, while the Company's original certificate of incorporation ("Original Charter") had been filed with the Delaware Secretary of State on May 20, 1994, it failed to name the initial board of directors.  Section 108 of the DGCL provides that, if the original charter does not name the initial board of directors, the incorporator must act to organize a corporation, *i.e.* adopt the bylaws and elect directors.  Vitacost had not complied with Section 108 because the "sole stockholder" – rather than the incorporator – acted to adopt the bylaws, elect the initial directors and issue shares to himself.  This violation of the DGCL meant the election of the Company's directors and initial stock issuance were invalid, and, arguably, that the Company had no validly elected directors or officers and no validly issued shares of stock.  Despite its representation that it performed a thorough review of the Company's corporate records, Shefsky failed to identify and bring to Vitacost's attention this critical defect, which, absent correction, called into doubt all subsequent corporate action by the Company.

23.     Indeed, the internal review revealed numerous defects that Shefsky failed to identify during due diligence and that Shefsky failed to disclose to Vitacost.

24.     For example, through its internal review, Vitacost learned that there were various issues with director succession.  Specifically, it was not clear from the minutes of Board and annual stockholder meetings whether certain directors were validly elected or appointed throughout the Company's history, calling into question all corporate resolutions since the Company's inception.  Nor was it clear whether directors actually signed documents reflecting action taken by written consent.  Given the due diligence purportedly conducted by Shefsky, Shefsky should have known of these defects.  Shefsky nonetheless failed to advise Vitacost of the impact of these defects in corporate governance and issued the unqualified Opinion Letter.

25.     Through its internal review, Vitacost also discovered that numerous other defects in its corporate governance and capital structure existed (and/or remained, despite efforts to remedy those defects through ratification).  For example, initial stock issuances and stock

offerings in 1994 and 1995-96, respectively, were neither properly authorized nor documented in violation of DGCL §§ 152 and 161.  Sections 152 and 161 require a board of directors to authorize the issuance of shares and determine the consideration to be received for the shares of stock prior to issuance.  As discussed above, in 1994, the sole stockholder purported to issue himself stock, but this did not adhere to the process required under Sections 152 and 161.  Similarly, beginning in 1995 and continuing into 1996, the Company was authorized to and began offering for sale shares of stock.  The Board, however, failed to approve the price for shares of stock prior to the Company's stock offering, which violated Sections 152 and 161.

26.     Given the due diligence conducted by Shefsky, Shefsky should have known of these defects.  Nonetheless, Shefsky failed to advise Vitacost of the impact of these defects in corporate governance and issued the unqualified Opinion Letter.

27.     Shefsky also failed to advise Vitacost that the Company's attempts to engage in stock splits at various times prior to the IPO did not comply with the DGCL.

28.     In July 1999, for instance, the Company purported to conduct a forward split of shares at "two for one."  The corporate records demonstrate a failure to comply with Section 242 of the DGCL when approving that stock split.  Specifically, the Board resolution approving the stock split did not set forth the text of the proposed amendment to the Company's Certificate of Incorporation reflecting the stock split, or declare the amendment to be advisable.  This is contrary to the mandatory procedure provided in DGCL § 242(b)(1).  While the Board at that time and Vitacost's shareholders purportedly attempted to correct this split in December 1999, the attempted ratification failed because the shareholders approved an amendment to the Certificate of Incorporation that was contrary to what the Board approved.  Thus, the remedy was still inadequate under the DGCL.  Though Shefsky should have discovered this defect during its purportedly extensive due diligence, it failed to advise Vitacost of this defect or the potential ramifications of same.

29.     Then, between June and August 2009 – in preparation for the IPO and under the guidance of Shefsky – and the specific direction of Goldsmith – the Company purported to

- 7 -

conduct a "four for five" reverse stock split.  Again, contrary to the mandatory procedure provided for in DGCL § 242(b)(2), the Board resolution approving the stock split did not set forth the text of the proposed amendment to the Company's Certificate of Incorporation reflecting the stock split, or declare the amendment to be advisable.  Shefsky, and in particular, Goldsmith, was aware of, and should have properly advised Vitacost of, this defect in corporate governance as Goldsmith, himself, served as secretary at the Board meeting wherein the resolution was approved.

30.     In conducting its due diligence, Shefsky also failed to identify defects in the issuance of stock options purportedly approved by Vitacost in 2001 and 2007.  Specifically, Shefsky failed to identify that Vitacost's corporate records demonstrate that the Company failed to comply with the mandatory requirements of the DGCL, specifically Sections 157(a)-(b), in issuing the stock options.  Indeed, despite its shareholders having attended the 2007 Board meeting, at which the stock option issuances were addressed and approved, Shefsky failed to appreciate and advise Vitacost of such errors.

*Shefsky's Purported "Fix"*

31.     Presumably in recognition of defects in the 1999 stock split and certain of the option issuances, in the days before the IPO commenced, Shefsky advised the Company that the Board should ratify all past common stock and option issuances pursuant to a unanimous written consent.  Shefsky provided no further detail to explain the basis for the Board action it proposed.

32.     Based on Shefsky's representations, Vitacost believed that Shefsky had conducted a thorough review of its corporate records prior to the Company's IPO.  Vitacost followed Shefsky's advice, not knowing that Shefsky's advice was negligent because it failed to adequately address the defects in Vitacost's corporate governance and capital structure that were identified during the subsequent internal review – including the fact that the August 2009 stock split performed under Shefsky's watch and direction violated Section 242 of the DGCL – and potential legal issues arising from those defects.

33.     Given those defects and the uncertainty surrounding Vitacost's capital structure, the Opinion Letter that Shefsky issued on September 18, 2009, for inclusion in Vitacost's Prospectus, not only misstated the legal status of the shares of common stock that Vitacost was to offer for sale, it also failed to identify material facts concerning the Company's corporate governance and capital structure that were at the very root of the defects in the shares Shefsky purported to validate in its Opinion Letter.

*The Cost of Relying On Shefky's Failures*

34.     Unaware of any remaining deficiencies or issues, and in reliance on Shefksy's unqualified Opinion Letter, Vitacost proceeded with its IPO, registering millions of shares of its common stock for sale to the public on the NASDAQ Global Market.  Vitacost's reliance on Shefsky's negligent Opinion Letter, legal work and advice proved to be catastrophic.

35.     During the internal review undertaken by the Audit Committee in Fall 2010, the Company was forced to delay filing its Quarterly Report on Form 10-Q for the period ending September 30, 2010.  At the conclusion of the internal review and the Audit Committee's report on December 1, 2010, the Board determined that the Company's financial statements could not be relied upon due to the issues relating to Vitacost's capital structure, including those detailed *supra* ¶¶ 22-30.  As a result of these serious issues, the Company's legal advisors and auditors informed Vitacost that they could not opine as to the number of shares that were authorized or validly issued, fully paid and nonassessable, which in turn prevented the Company from filing the requisite Quarterly Reports on Form 10-Q and Annual Report on Form 10-K.

36.     On December 7, 2010, the Company filed a Report on Form 8-K with the SEC postponing the Company's annual meeting and stating that its financial statements could no longer be relied upon due to the issues relating to Vitacost's corporate governance and capital structure.  In response, NASDAQ halted trading of Vitacost's stock – beginning the longest halt of trading in the history of NASDAQ – and began delisting proceedings.  The SEC also initiated an informal inquiry into the Company.

37.     While responding to the NASDAQ delisting proceedings and the SEC's informal inquiry, the Company and its legal advisors worked to develop a plan to rectify the defects in the Company's corporate governance and capital structure.

38.     In the midst of these actions, a shareholder who had previously issued a demand to the Vitacost Board and a shareholder who had previously filed a derivative action in Florida state court, requested information from the Company concerning its disclosures regarding the corporate governance and capital structure defects addressed in the December 7, 2010 Form 8-K.

39.     Operating under exceptionally tight time constraints – responding to deadlines set by NASDAQ – the Company attempted to come up with feasible plans to remedy the capitalization and corporate governance issues short of filing for bankruptcy, which would have been catastrophic and irreparably damaged both the Company and its stockholders.  Vitacost and its counsel and advisors identified and worked with derivative plaintiff's counsel to develop a two-step process by first using the pending derivative action as a vehicle to settle the capitalization questions and then second, effecting a merger to restructure Vitacost to address the corporate formation and organizational defects.

40.     To rectify the corporate governance and capital structure issues that Shefsky either failed to detect or was negligent in advising Vitacost as to the risks inherent in those issues and their ability to be cured, Vitacost incurred substantial damages.  Vitacost paid in excess of $2 million in legal fees and costs to counsel in connection with the NASDAQ delisting proceedings, compliance with the SEC inquiry and the defense and settlement of the shareholder derivative action.  In addition to its own fees, to settle the derivative action Vitacost paid $3.5 million in attorneys' fees to shareholders' counsel.  The Company also incurred over $2.5 million in internal costs and expenditures caused by the fallout from Shefsky's negligent work and advice.

41.     In addition, Vitacost suffered a market capitalization loss in excess of $50 million as a result of Shefsky's negligent advice and their failure to disclose issues relating to the deficiencies in Vitacost's corporate governance and capital structure.

42.     Finally, as a result of Shefsky's negligent advice and the fallout therefrom, Vitacost has retained the undersigned counsel and is obligated to pay the undersigned counsel a reasonable fee for services provided in connection with this lawsuit.

## Count I:  Breach of Fiduciary Duty

43.     Vitacost incorporates by reference and realleges each and every allegation contained in Paragraphs 1 through 42 above, as though fully set forth herein.

44.     An attorney/client relationship existed between Shefsky and Vitacost as a result of which Vitacost placed tremendous trust and confidence in Shefsky and the attorneys Shefsky assigned to the file, and Shefsky (and the assigned attorneys) in turn owed Vitacost certain fiduciary duties.

45.     Shefsky's fiduciary duties to Vitacost included not only a duty of loyalty but also a duty of care, pursuant to which Shefsky, including specifically, but not limited to, Shareholder Goldsmith, was required to carry out legal services on behalf of Vitacost in compliance with the general standards and procedures of the legal profession.

46.     Through the above-referenced actions, Shefsky, including specifically, but not limited to, Shareholder Goldsmith, breached fiduciary duties owed to Vitacost.

47.     As a direct and proximate result of Shefsky's' breach of fiduciary duties, Vitacost has suffered damages, including incidental, consequential, and compensatory damages, as well as prejudgment and post-judgment interest, in an amount exceeding $9,000,000.00.  Vitacost is entitled to recover these damages in an amount to be determined at trial.

WHEREFORE, Vitacost respectfully requests that this Court enter judgment in its favor and against Shefsky and award Vitacost compensatory and consequential damages, including prejudgment and post-judgment interest, in an amount to be proven at trial, plus punitive damages, attorneys' fees, paralegal fees, and costs incurred in this action, and such other relief as this Honorable Court deems just and proper.

{26138220;1}   AKERMAN SENTERFITT, 222 LAKEVIEW AVENUE, FOURTH FLOOR, WEST PALM BEACH, FL  33401

## **Count II: Breach Of Contract**

48.     Vitacost incorporates by reference and realleges each and every allegation contained in Paragraphs 1 through 42 above, as though fully set forth herein.

49.     The parties entered into a valid Contract pursuant to which Shefsky agreed to perform legal services for Vitacost.

50.     Pursuant to the Contract, Vitacost was obligated to pay the legal fees and costs billed to Vitacost in connection with Shefsky's work on the Company's IPO.  Vitacost has paid and provided the consideration required by the Contract to Shefsky in full, a total of $726,632.

51.     Shefsky materially breached the express and implied terms of the parties' Contract in various ways as detailed above.

52.     As a direct, foreseeable and proximate result of Shefsky's breach of the Contract, Vitacost has suffered damages, including incidental, consequential, and compensatory damages, as well as prejudgment and post-judgment interest, in an amount exceeding $9,000,000. Vitacost is entitled to recover these damages in an amount to be determined at trial.

WHEREFORE, Vitacost respectfully requests that this Court enter judgment in its favor and against Shefsky and award Vitacost compensatory and consequential damages, including prejudgment and post-judgment interest, in an amount to be proven at trial, plus punitive damages, attorneys' fees, paralegal fees, and costs incurred in this action, and such other relief as this Honorable Court deems just and proper.

## **Count III: Professional Negligence**

53.     Vitacost incorporates by reference and realleges each and every allegation contained in Paragraphs 1 through 42 above, as though fully set forth herein.

54.     Vitacost employed Shefsky to plan and execute the Company's IPO, including conducting all necessary due diligence and preparing the requisite documentation.

55.     Pursuant to the parties' Contract, Shefsky was engaged in its professional capacity to perform professional legal services.  Shefsky had a duty to exercise ordinary care, skill and

{26138220;1}  AKERMAN SENTERFITT, 222 LAKEVIEW AVENUE, FOURTH FLOOR, WEST PALM BEACH, FL  33401

diligence in carrying out such services, specifically including complying with the general standards and procedures of the legal profession.

56.     Shefsky failed to exercise the required degree of care, skill, knowledge, prudence and diligence required in the legal profession.

57.     As set forth in detail above, Shefsky was negligent in failing to detect and apprise the Company of serious deficiencies relating to the Company's formation, capital structure and share issuance and the ramifications of non-compliance with the DGCL relating to, among other things, the formation of the Company's original board of directors and in providing the Opinion Letter, which falsely represented that the shares of stock to be offered for sale in the IPO were duly authorized, validly issued, fully paid and nonassessable.

58.     As a direct, foreseeable and proximate result of Shefsky's negligence, Vitacost has suffered damages, including incidental, consequential, and compensatory damages, as well as prejudgment and post-judgment interest, in an amount exceeding $9,000,000.  Vitacost is entitled to recover these damages in an amount to be determined at trial.

WHEREFORE, Vitacost respectfully requests that this Court enter judgment in its favor and against Shefsky and award Vitacost compensatory and consequential damages, including prejudgment and post-judgment interest, in an amount to be proven at trial, plus punitive damages, attorneys' fees, paralegal fees, and costs incurred in this action, and such other relief as this Honorable Court deems just and proper.

## Count IV: Negligent Misrepresentation

59.     Vitacost incorporates by reference and realleges each and every allegation contained in Paragraphs 1 through 42 above, as though fully set forth herein.

60.     Having undertaken the representation of Vitacost in connection with the Company's IPO, Shefsky assumed a pecuniary duty to provide accurate information and advice to Vitacost.

61.     Nonetheless, as set forth in detail above, Shefsky carelessly and negligently failed to fully apprise Vitacost of the nature and extent of numerous defects that permeated the

Company's corporate governance and capital structure despite Shefsky's purportedly extensive due diligence which should have revealed same.   Further, Shefsky made affirmative representations about the Company's ability to remedy certain defects through ratification, which Shefsky may have believed to be true at the time, but which were in fact false and contrary to law, and which Shefsky should have known or discovered through the exercise of reasonable care and diligence.

62.    Shefsky's numerous omissions and misrepresentations culminated in its delivery of the unqualified Opinion Letter to Vitacost, which contained representations that Shefsky may have believed to be true at the time, but which were in fact false and contrary to law, and which Shefsky should have known or discovered through the exercise of reasonable care and diligence.

63.    Shefsky failed to exercise reasonable care and was careless and negligent in failing to obtain and communicate to Vitacost information that was truthful, accurate and could be relied upon by the Company throughout the IPO process, including, most egregiously, but certainly not limited to, the information contained in the Opinion Letter.

64.    Shefsky intended and/or expected that Vitacost rely on its advice throughout the IPO process and, in particular, that Vitacost rely on the Opinion Letter in proceeding with the IPO.   Indeed, Shefsky intended and/or expected that Vitacost attach the Opinion Letter to its Prospectus.

65.    Vitacost reasonably and justifiably relied on Shefsky's advice, including, but not limited to, the Opinion Letter, in taking the Company public.

66.    Vitacost suffered economic injury as the direct and proximate result of its reliance on Shefsky's advice, including, but not limited to, the Opinion Letter.

67.    As a direct, foreseeable and proximate result of Shefsky's negligent omissions and misrepresentations in rendering the advice, Vitacost has suffered damages, including incidental, consequential, and compensatory damages, as well as prejudgment and post-judgment interest, in an amount exceeding $9,000,000.   Vitacost is entitled to recover these damages in an amount to be determined at trial.

WHEREFORE, Vitacost respectfully requests that this Court enter judgment in its favor and against Shefsky and award Vitacost compensatory and consequential damages, including prejudgment and post-judgment interest, in an amount to be proven at trial, plus punitive damages, attorneys' fees, paralegal fees, and costs incurred in this action, and such other relief as this Honorable Court deems just and proper.

## Jury Demand

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: <u>April 4, 2013</u>
West Palm Beach, FL

Respectfully submitted,

<u>/s/ David I. Spector</u>
David I. Spector (Florida Bar No. 086540)
E-mail:  david.spector@akerman.com
Melissa S. Zinkil (Florida Bar No. 0653713)
E-mail:  melissa.zinkil@akerman.com
Ashleigh Bhole (Florida Bar No. 086728)
E-mail:  ashleigh.bhole@akerman.com
**AKERMAN SENTERFITT**
222 Lakeview Avenue, Suite 400
West Palm Beach, FL  33401-6183
Telephone:  561.653.5000
Facsimile:  561.659.6313

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2013 I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that upon the Clerk of Court's issuance of a Summons, the foregoing document will be served upon Plaintiff via service of process.

<u>/s/ David I. Spector</u>
David I. Spector (Florida Bar No. 086540)